## Case No. 619.

### The ATLANTA.

[2 Spr. 251;[1] 3 Amer. Law Reg. (N. S.) 675; 26 Law Rep. 204.]

District Court, D. Massachusetts. Jan., 1864.[2]

[PRIZE — WHAT CONSTITUTES THE CAPTURING FORCE — DISTRIBUTION BETWEEN CAPTORS AND THE UNITED STATES.]

[1. A war vessel within signal distance of another, making a prize, is entitled to share in the prize, under 12 Stat. 606, § 3, but is not a part of the "capturing force," within the meaning of section 2, providing that, where the capturing force is superior, the prize shall be divided equally between the United States and the officers and men making the capture.]

[Cited in The Selma, Case No. 12,647.]

[See note at end of case.]

[2. The Confederate ironclad Atlanta came down Warsaw sound on June 17, 1863, to attack the United States monitors Nahant and Weehawken, stationed there to prevent the Atlanta's egress, supposing herself superior to their combined force. The monitors steamed away from the Atlanta until fully prepared for action, when the Weehawken turned, followed immediately by the Nahant, and both vessels ran towards the Atlanta, which had directed her fire wholly against the Nahant. As they approached, the Weehawken fired five shots, with such effect as to compel the Atlanta's surrender. The Nahant had reserved her fire for closer range, but had never been more than 1,000 yards from the Weehawken, and, at the time of the surrender, was equally distant with the latter from the Atlanta. Held, that the Nahant was a part of the "capturing force," within the meaning of 12 Stat. 606, § 2.][3]

[See note at end of case.]

[3. Each monitor was inferior to the Atlanta in tonnage, armament, and number of crew, but together they were superior in these respects. Held, that the capturing force was superior, and that half the prize should go to the United States, under 12 Stat. 606, § 2.][3]

[See note at end of case.]

---

[1] [This case was originally reported by Hon. Richard H. Dana, Jr., with the following syllabus: "What co-operation constitutes a vessel one of 'the vessels making the capture,' for the purpose of determining the relative force of the captors and the prize." Opinion reprinted from 2 Spr. 251, by permission.]

[2] [Affirmed by the supreme court in The Weehawken v. The Atlanta, 3 Wall. (70 U. S.) 425.]

[3] [The provisions of the statutes at the time of this case were as follows, (12 Stat. 606:) "§ 2. And be it further enacted, that the proceeds of all ships and vessels, and the goods taken on board of them, which shall be adjudged good prize, shall, when of equal or superior force to the vessel or vessels making the capture, be the sole property of the captors; and when of inferior force, shall be divided equally between the United States and the officers and men making the capture. § 3. * * * Fourth. When one or more vessels shall be within signal distance of another making a prize, all shall share in the prize." These are slightly changed in the Revised Statutes. "§ 4630. The net proceeds of all property condemned as prize, shall, when the prize was of superior or equal force to the vessel or vessels making the capture, be decreed to the captors; and when of inferior force, one-half shall be decreed to the United States and the other half to the captors, except that in case of privateers and letters of marque, the whole shall be decreed to the captors, unless it shall be other-

[In admiralty. Libel in rem by the officers and men of the United States monitors Weehawken and Nahant and the United States steamer Cimmerone, as captors, against the ironclad ram Atlanta, a prize. Decree awarding one-half the prize money to the United States, and one-half to the libellants.]

R. H. Dana, Jr., U. S. Atty.

Mr. Hodge, of Washington, agent of captors, submitted a written argument.

C. P. Curtis, Jr., afterwards appeared for the captors.

SPRAGUE, District Judge. This vessel, an iron-clad war steamer, taken from the rebels in battle, has been condemned as lawful prize, and the question now is on the distribution. The main and difficult question is, whether the entire value is to go to the captors, or half to them and half to the government. The act of 1862, c. 204, § 2, (12 Stat. 606,) prescribes the rule thus: If the prize is "of equal or superior force to the vessel or vessels making the capture," it goes wholly to the captors; if of inferior force, it is divided equally between the United States and the "officers and men making the capture." The third section provides for the distribution of the whole or half adjudged to the captors in these words: "When one or more vessels of the navy shall be within signal distance of another making a prize, all shall share in the prize." In determining whether the captors shall have half or all, the court must first decide what vessel or vessels "made the capture" or "made the prize," and then compare the capturing force with the force of the prize. Then, having by this process adjudged the whole or the half to the vessels making the prize or capture, the court is to determine whether any and what vessels of the navy were within signal distance of the vessel or vessels that made the prize, and let them in to participation.

What vessel or vessels, in this case, "made the capture"? The officers of the Atlanta, now prisoners of war at Fort Warren in this harbor, have refused to testify, so that I have not the benefit of their statements. But still the evidence in the cause presents a clear account of this most interesting conflict,—perhaps, in its bearings on naval science, the most significant battle in modern times, except that of the Monitor and Merrimac. The Atlanta, originally a British steamer, powerful and fast, called the Fingal, had, early in the war, run the blockade of Savannah, and had been converted by the rebels into an iron-clad war steamer, at a vast expense. She had a long low deck, with

wise provided in the commissions issued to such vessels." "§ 4632. All vessels of the navy within signal-distance of the vessel or vessels making the capture, under such circumstances and in such condition as to be able to render effective aid, if required, shall share in the prize."]

a casemate or covered iron-plated house in the centre, with sloping sides and ends, in which was her battery. She had also a powerful ram, and, attached to her bow and carried under water, a torpedo charged with about fifty pounds of powder. Two steam vessels of our navy, of the type so novel, and yet already so universally known as "monitors," were guarding the Warsaw sound, to prevent the egress of the Atlanta. These were the Weehawken, commanded by Captain John Rodgers, and the Nahant, commanded by Captain John Downes. Captain Rodgers was the senior and commanding officer. Each monitor had one revolving turret, with two smooth-bore Dahlgren guns, one of fifteen-inch and the other of eleven-inch calibre. The rebels knew that these monitors were there, and knew their size and force; and the Atlanta, when fully ready, was sent down the sound for the purpose of capturing or destroying them. It would seem, too, that they had little doubt of their success. The Atlanta was accompanied by several steamers having passengers on board, to be spectators of the conflict. Two of these steamers were armed, and belonged to the rebel navy; but, being wooden vessels, they kept at a safe distance, and took no part in the action. On our side, also, there was the wooden gunboat Cimmerone, which was directed by Captain Rodgers to keep out of the action unless signalled specially.

It was at early dawn on the 17th of June, 1863, a little after four o'clock, that the Atlanta was descried coming down the sound. The monitors at once began to prepare for action. The Weehawken lay higher up than the Nahant. She slipped her cable. The Nahant weighed her anchor, Captain Downes thinking he might need it in the action in case of injury to his motive power, and that he could prepare for action as well while weighing. To give themselves time to get fully ready, Captain Rodgers steamed slowly down the sound, directing Captain Downes to follow in his wake, the Weehawken having the pilot. Captain Downes followed in the wake of the Weehawken as soon as he got his anchor. This left him for a time nearer to the advancing enemy than the Weehawken. When fully ready, the Weehawken turned toward the enemy. Just as she turned, the Atlanta opened her fire on the Nahant. Her shot did not take effect. The Weehawken rounded and steamed towards the Atlanta, the Nahant following in her wake. It was then seen that the Atlanta was stationary, and lying partly across the channel. When within between three hundred and four hundred yards, the Weehawken slowed, and fired her fifteen-inch gun. Drifting with the tide, and under slow way, when within about two hundred yards, she fired both her guns, as nearly together as possible. Captain Downes acted on a different plan. He thought his fire would be most effectual close aboard, and made directly for the Atlanta at full

speed, reserving his fire until he should be at close quarters. Captain Downes was never from the first more than a thousand yards separated from the Weehawken, and at this second discharge was about the same distance from the Atlanta that the Weehawken was. Immediately after the second discharge from the Weehawken, the Atlanta hauled down her colors, and ran up a small white flag, in token of surrender. This was mistaken by the Weehawken, in the smoke, for a white and blue flag, which was the rebels' battle-flag, and the Weehawken fired both her guns again. By this time, the Nahant was very near the Atlanta, and ready to fire, but discovered that she had surrendered. Captain Downes ranged alongside, in natural disappointment, and asked why she surrendered so soon. The monitors had dropped their boats overboard to clear for action. The Nahant's boats were nearest, and she steamed off for them, and picked one of them up; and her executive officer boarded the Atlanta, and took possession of her. In the mean time, however, the commander of the Atlanta had lowered his own boat, and went on board the Weehawken, and had surrendered·his sword to Captain Rodgers, before the Atlanta was boarded by the Nahant.

After the surrender, we learned the effect of our shot, partly from observation and partly by statements of the rebel officers. The first shot from the Weehawken—a fifteen-inch ball, cored, as it is termed, that is, with a hollow sphere in the centre, in this case of six inches, weighing four hundred pounds, and fired with thirty-five pounds of powder, at a distance of between three and four hundred yards—struck the Atlanta upon the side of her casemate, knocking a hole in it, but without going through, and scattering over the inclosed decks great quantities of wood and iron splinters, some of dangerous size, wounding several men, and prostrating on deck, insensible, many others. The rebel officers told our officers that as many as forty persons were knocked down, and either wounded, or stunned for the moment, by the effects of this shot, and that it demoralized the entire crew. The next discharge, at about two hundred yards distance, was from both guns,—a fifteen-inch cored shot, and an eleven-inch solid shot, the latter weighing one hundred and sixty-eight pounds. One of these—it is thought the fifteen-inch—struck the top of the pilot-house, crushing and driving down the bars on the top and sides, wounding both pilots and one helmsman, and stunning the other helmsman as well as the wounded men. These men fell on the floor of the pilot-house, and, the rebel officers said, prevented any one from getting up into it. The other shot struck the edge of the overhung knuckle, where the casemate fits to the deck, doing little damage. In the words of Captain Rodgers, the first shot took away the desire

to fight, and the second the ability to get away. One of the two guns fired at the last discharge struck a port-stopper, breaking it in two, and driving its fragments through the port. No statement is made as to the effect of the fifth shot fired.

It is admitted by the officers of both monitors, that the gunboat Cimmerone was all the while within signal distance, and acting under the orders of the senior officer, and consequently entitled to participate in the distribution, as being "within signal distance of the vessel or vessels making the prize." The only question as to her is, whether she is to be counted in as part of the capturing force; that is, whether she is to be deemed one of the vessels "making the capture," within the meaning of the statute, when we are comparing the force of the captors with that of the prize, for the purpose of determining whether the proceeds belong wholly to the captors or are to be divided between them and the government. In the recent case of The Cherokee, [Case No. 2,640,] I had occasion to examine the question of joint capture; and I refer to the results then reached, so far as they bear upon this case. The English statutes and orders in council do not make the distinction, in distribution, based on superiority or inferiority of force. The entire prize is given in all cases to the captors. Consequently, we cannot find in British decisions any direct aid in solving the present question. Neither have their statutes or orders in council, until the Russian war, made any distinction between actual captors and vessels in sight of the actual captors, but have simply given the entire prize to "the takers." The courts, in applying the rules, have made liberal constructions of the word "takers," on reasons of policy and equity, and have included in the term "takers," by construction, vessels within sight under such circumstances that they may be held to have afforded encouragement to the captors and intimidation to the enemy. This has naturally led the courts to speak of some vessels as actual captors, and others as constructive captors. Still, as relative force was immaterial, and a vessel claiming to be an actual captor would usually be at least a constructive captor, and the shares of each would be the same, we do not find anywhere in the British decisions a definition or test of the difference between actual and constructive captors, which is of practical value in the application of our own statute.

Our statutes, as I held in The Cherokee, [supra,] recognized two classes, vessels making the capture and vessels which do not make the capture, but are within signal distance of those that do. From this the inference is, that the mere fact of being within signal distance, able and ready to give aid, if required, does not bring a vessel into the first class. If it did, we should confound the distinction made by the statute, and

treat as actual captors all who were within signal distance of actual captors. Another result would follow, that all vessels within signal distance of this second class of vessels would share in the distribution, though not within signal distance of the first class, because they would be within signal distance of some of the vessels which we should have held to be vessels making the capture. I have no difficulty, therefore, in deciding that I must exclude the Cimmerone, in determining the relative force of the captors and the prize. In like manner, I exclude the gunboats of the rebels which were within signal distance of the Atlanta, but kept aloof.

It now becomes necessary to compare the force of the Atlanta with that of our monitors.

Beside the depositions, complete drawings of the Atlanta have been annexed to Captain Rodger's evidence, and a report from the bureau of construction. The Atlanta's dimensions were as follows: Length, 191 feet 2 inches; extreme beam, 40 feet 6 inches; depth of hold to top of beam, 13 feet and one-half inch. These dimensions make her measurement tonnage 927 6-10 tons, or if, as the agent of the captors contends, we must include the thickness of the deck, 1075 8-95 tons. She was plated with two layers of iron, one horizontal and one vertical, each two inches thick, making four inches of plating. At the knuckle, where the casemate was fastened to the hull, her sides were six feet in thickness of solid wood. Her deck was two feet one inch in thickness of plank, beside the iron covering. Her casemate was a little over one hundred feet in length, fastened to the hull, in about the middle of the length of the deck, and covering its entire width, leaving an open deck of about forty-five feet at each end. This casemate had sloping sides and ends, at an angle of twenty-nine degrees from the horizontal, and three ports on each side, with heavy port-stoppers. The sides of the casemate were four inches of iron and thirty-six inches of solid wood. She mounted four guns, Brooke's rifled ordnance,—two of seven inch, throwing balls of one hundred and fifty pounds, and two of six inch, throwing balls of one hundred pounds; the six-inch guns working in broadsides, and the seven-inch guns, one at the forward and one at the after end of the casemate, working on pivots, either as broadside, or as bow and stern guns, so that three of her four guns could be used on either broadside. She had a powerful ram of solid wood, strapped with iron bands, above water; and a torpedo at the end of a jointed crane, capable of being raised in the air or lowered under water, carried about twenty feet beyond the bow, and charged with some fifty pounds of powder, expected to explode on concussion. Her crew were one hundred and forty-three, all told. The two monitors were as nearly equal, indeed as nearly identical, as it is easy to suppose war vessels to be. They were each 844 tons measurement, armed and arranged alike, with the usual low deck of the monitors, but little above the water line, with one revolving turret. Their guns were of the same calibre; one of fifteen-inch, and one of eleven-inch, smooth-bore Dahlgrens; the former throwing shots of 440 pounds solid and 400 pounds cored, and the latter 168 pounds solid. The Weehawken had eighty-four men, and the Nahant eighty-five men.

In comparing the force of these novel engines of war, the old rules of naval science are superseded. Not only are the vessels extraordinary and experimental, but the ordnance scarcely less so. The first shot from the Weehawken is said to have been the first iron shot of that size ever fired in naval warfare. I entertain no serious doubt that the force of the two monitors combined was superior to that of the Atlanta (I do not judge merely by the result); I am aware that a different course on either or both sides, might have presented a different aspect. If the Atlanta had run at the monitors with her full force, instead of lying still to take and give fire, and her torpedo had exploded under one of them successfully; or if she had struck both, or either of them, with the full force of her ram; or if a better-aimed or more fortunate shot had injured the turret, or the steering or motive power, of either monitor; or if the first two shots from the Weehawken had been less skilfully directed, or less fortunate, or the Weehawken had reserved her fire to the last, and thus the Atlanta had been able to use her battery steadily until at close quarters,—under any or all these suppositions, the length of the contest, and the injuries on each side, might have been very different, if the final result had been the same. I am to consider the means the vessels possessed, and not the use they made of them. Still, I am satisfied, that, for offence and defence, the two monitors, with their batteries, acting together, at the same time, and under one command, must be considered of superior force to the Atlanta. They were each of 844 tons, and the Atlanta of about 1000 tons. They had, one eighty-four, and the other eighty-five men, and the Atlanta one hundred and forty-three men. The effective power of large ordnance against ironclads has not yet been fully tested by experience; and, in the present state of our knowledge, the actual effect of the shot of the Weehawken must have much influence in forming our opinion. I am constrained to think that two fifteen-inch and two eleven-inch smooth-bore Dahlgrens, mounted on two vessels, capable of taking separate positions, are superior, for offence, to two seven-inch and two six-inch rifled Brookes, in one vessel. And in case of a fight on the decks, by boarding or otherwise, we had the superiority of men. As to defence, the Atlanta presented a larger surface than the monitors, and could be more easily hit; and the result show-

ed that the walls of her sides and pilot-house, however strong, were not, in fact, a protection against the shot of the monitors at that range. We do not know, by experiment, how well our hulls and turrets would have resisted her shot; but a construction which avoids shot is an element to be calculated, as well as one which resists shot. Indeed, neither the agent of the captors, in his argument, nor the two commanders, in their depositions, appear to contend, or to give an opinion, that the Atlanta was equal, or superior to, the two monitors.

The agent for the captors contends that, in comparing the forces, the Weehawken alone is to be counted. It is said, that the only shot fired, and the only damage done, was by the Weehawken, and that her shot compelled the surrender; that the Atlanta was put beyond the possibility of fighting or escaping, by the first two shots, and actually surrendered, by reason of them, before the Nahant had, in fact, done any thing. It is contended, that it was not necessary that the Nahant should have been present; that the Atlanta did not surrender by reason of intimidation from the presence and approach of the Nahant, but by reason of her own totally disabled condition. It is further argued, that the Nahant must be considered only a constructive captor; that she was within signal distance, ready and eager, and doing her best to aid in the battle; so situated as to afford encouragement to our side, and intimidation to the enemy; but that such is the definition of a constructive captor, and that the facts go no further. It may be said, too, that the policy of the statute is to stimulate vessels to attack equal or superior vessels at once and alone; and that if a vessel does so, and succeeds, before others actually strike a blow, the entire prize should go to the captors; and that, in such case, it ought to be deemed immaterial how near the others may be, or on what theory of battle they reserved their fire. In a question solely between conduct of the highest merit and the public treasury, the government would doubtless desire a construction liberal to the officers and men who perilled all in a strange and unwonted conflict, and attained a success that has attracted the attention of the world. But my duty is limited to construing the statute. I cannot make a gratuity of the public property, however meritorious the object.

I shall decide the present case on its exact and peculiar circumstances. I lay down no rule for other cases, nor do I say what variation from the facts of this case would have led to a different application of the statute. I am led to the belief that the Nahant must be considered so far a participator in the conflict of forces, as to be included in the comparison. The Atlanta came down to attack both the monitors, knowing they were together, under one command, and for one purpose. She calculated on their combined force, and governed herself accordingly. It is impossible for me to say now, whether the Atlanta would have taken the same course, if she had had only the Weehawken to deal with. Each monitor knew that the other was co-operating,—not merely ready to co-operate, but actually taking part in the attack, during all the time, within effective distance for firing, and part of the time at nearly the same distance from the enemy, with her consort, and one as capable as the other of all acts of offence and defence. This is not all. It was the Nahant that the Atlanta fired at. The Nahant drew off the fire of the enemy, and engaged its offensive force, so far aiding her consort. It was known to those on board the Atlanta, that the Nahant, apparently uninjured by their previous fire, was coming upon the Atlanta at full speed, reserving her fire, though within easy range. This would have been enough to settle a doubtful question of surrender, if a doubt remained. One of the facts to be considered by the commander of the Atlanta, in determining whether and when to surrender, might well have been the demoralized state of his crew. How far may the knowledge that a second monitor of the same force with that from which they had suffered so terribly was within equal distance, have contributed to this demoralization? How far did the co-operation of the two monitors affect the course taken by the Atlanta in all respects, the training her guns on the Nahant, her lying still to present her broadside? How far did this co-operation affect the course taken by each monitor? If the Weehawken had not been there, or had not opened fire, would or would not Captain Downes have reserved his fire as he did? If the Weehawken had been alone, or with a vessel within signal distance capable of aiding, but not just where the Nahant was, and doing just what she was doing, would or would not her course have been the same? If the Nahant had not diverted the fire of the Atlanta, what might have been its effect on the Weehawken? If Captain Rodgers's shot had been unsuccessful, might or might not, in a few minutes, almost seconds, the close discharge of the Nahant have been decisive?

The result to which I am brought is, that in comparing the force of "the vessel or vessels making the capture" with that of the prize, I must include the Nahant with the Weehawken. I do this, as the result of the special circumstances of this case, without attempting to establish a test for determining who, under other circumstances, should be deemed actual captors. The result is, that half the net proceeds of the prize are to be given to the captors, and half to the United States, and that the vessels entitled to participate in the distribution are the Weehawken, Nahant, and Cimmerone.

[NOTE. The officers and crew of the Weehawken, John Rodgers commanding, took an appeal to the supreme court, which affirmed the

decree. The Weehawken v. The Atlanta, 3 Wall. (70 U. S.) 425. Mr. Justice Field, in delivering the opinion, said: "'The mere fact that the only shot fired, and the only damage done, was by the Weehawken, is not decisive. Other circumstances must be taken into account in determining the matter; such as the force, position, conduct, and intention of the Nahant. The two vessels were known to be under the same command and of nearly equal force. The Atlanta descended the sound to attack both, and governed herself with reference to their combined action. It is not reasonable to suppose that her course would have been the one pursued had she had only the Weehawken to encounter. Besides, the fire of the Atlanta was directed entirely to the Nahant, and of course diverted from her consort. It is possible that a different result might have followed had the fire been turned upon the Weehawken. This diversion must be considered in every just sense of the term as giving aid to her. Again, the power of the shot of the Weehawken had evidently surprised the officers of the Atlanta, who found their vessel speedily disabled, and their crew demoralized. The advance upon her, at full speed, of a second monitor, of equal force, ready to inflict similar injuries, may have hastened the surrender. It can hardly be supposed that the approach of the second monitor did not enter into the consideration of the captain and officers of the Atlanta. If the shot from the guns of one of the monitors could, in a few moments, penetrate the casemate of the Atlanta, crush in the bars of her pilot house, and prostrate between forty and fifty of her men, her captain might well conclude that the combined fire of both would speedily sink his vessel and destory his entire crew. It cannot be affirmed, nor is it reasonable to suppose, that any of the incidents of the battle would have occurred as they did if the Nahant had not been present in the action. We concur, therefore, in the view of the learned district judge, that, in the comparison of the forces engaged in the conflict, the Nahant must be included with the Weehawken.'"]